# In the United States Court of Federal Claims

BID PROTEST
No. 20-724C
Filed Under Seal:  November 23, 2020
Reissued: January 5, 2021*

|  |  |  |
|---|---|---|
| PROSECURE, LLC, | ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) | Post-Award Bid Protest; Judgment Upon the Administrative Record; RCFC 52.1; Best Value Determination; Injunctive Relief. |
| THE UNITED STATES, | ) ) ) | |
| Defendant, | ) ) | |
| v. | ) ) | |
| CDA INCORPORATED, d/b/a, MAXSENT, | ) ) ) | |
| Defendant-Intervenor. | ) ) ) | |

*Adam K. Lasky*, Counsel of Record, Oles Morrison Rinker & Baker LLP, Seattle, WA, for plaintiff.

*Alison Schilling Vicks*, Trial Counsel, *Deborah Bynum*, Assistant Director, *Robert E. Kirschman, Jr.*, Director, *Ethan P. Davis*, Acting Assistant Attorney General, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC; *Denise McLane*, Of Counsel, Department of Homeland Security, for defendant.

*Meghan F. Leemon*, Counsel of Record, *Peter B. Ford*, *Patrick T. Rothwell*, *Timothy F. Valley*, Of Counsel, PilieroMazza PLLC, Washington, DC, for defendant-intervenor.

---

* This Memorandum Opinion and Order was originally filed under seal on November 23, 2020.  ECF No. 36.  The parties were given an opportunity to advise the Court of their views with respect to what information, if any, should be redacted from the Memorandum Opinion and Order.  Defendant-Intervenor filed a joint status report on behalf of the parties on December 21, 2020, proposing certain redactions which the Court has adopted.  ECF No. 38.  And so, the Court is reissuing its Memorandum Opinion and Order, dated November 23, 2020, with the agreed-upon redactions indicated by three consecutive asterisks within brackets ([* * *]).

## MEMORANDUM OPINION AND ORDER

GRIGGSBY, Judge

## I.      INTRODUCTION

Plaintiff, ProSecure, LLC ("ProSecure"), brings this post-award bid protest action challenging the Department of Homeland Security, Federal Protective Service's ("FPS") decision to award a contract for protective security officer services to CDA, Inc. *dba* MaxSent ("MaxSent"). The parties have filed cross-motions for judgment upon the administrative record, pursuant to Rule 52.1 of the Rules of the United States Court of Federal Claims ("RCFC"). *See generally* Pl. Mot.; Def. Mot.; Def.-Int. Mot.  For the reasons discussed below, the Court:  (1) **DENIES** ProSecure's motion for judgment upon the administrative record; (2) **GRANTS** the government's cross-motion for judgment upon the administrative record; (3) **GRANTS** MaxSent's cross-motion for judgment upon the administrative record; and (4) **DISMISSES** the complaint.

## II.     FACTUAL AND PROCEDURAL BACKGROUND[1]

### A.      Factual Background

This post-award bid protest dispute involves a challenge to the FPS's decision to award a contract to provide protective security officer ("PSO") services at certain government facilities located in the state of Alaska (the "Alaska Contract").  Compl. at ¶ 1.  Plaintiff, ProSecure, is a service-disabled, veteran-owned business joint venture under the United States Small Business Administration's All Small Mentor-Protégé Program.  *Id.* at ¶ 4.  The joint venture consists of two partners—Meritus Solutions Group, LLC ("Meritus") and American Eagle Protection Services Corporation ("AEPS").  *Id.*

On April 1, 2019, the FPS issued Request for Proposals No. 70RFPW19RWA000003 (the "RFP") for PSO services to be provided throughout the state of Alaska.  AR Tab 11 at 130. The RFP is a total small-business set-aside in accordance with Federal Acquisition Regulations

---

[1] The facts recited in this Memorandum Opinion and Order are taken from the administrative record ("AR"); ProSecure's motion for judgment upon the administrative record ("Pl. Mot."); and the government's and MaxSent's cross-motions` for judgment upon the administrative record ("Def. Mot.; Def.-Int. Mot.").  Except where otherwise noted, the facts cited herein are undisputed.

("FAR") Part 12 and a best-value procurement, pursuant to FAR Part 15.  AR Tab 14.1 at 2207; AR Tab 25 at 1157.

Under the terms of the RFP, the FPS would evaluate responsive proposals under two technical evaluation factors:  (1) relevant past performance and (2) management approach, with past performance being more important than management approach.  AR Tab 11(a) at 576; AR Tab 25 at 1157.  The FPS's evaluation of the aforementioned two technical factors was to be conducted by a technical evaluation team ("TET") and documented in a technical evaluation team report ("TET Report").  AR Tab 14.1 at 2207-09; *see generally* AR Tab 25.  In addition, the RFP provides that each offeror would receive one of five adjectival ratings for each technical factor, including:

| Adjectival Rating Description | Description |
| --- | --- |
| Highly Acceptable | Proposal meets and exceeds the requirements for an acceptable rating; a high probability of success in contract performance is demonstrated through some or all of the following:  (1) the proposal exceeds the solicitation requirements; (2) the proposal offers innovations and/or creative approaches that are beneficial to the Government; (3) the proposal demonstrates a superior understanding of the solicitation requirements and/or; (4) the level of performance risk associated with the proposal is substantially less than the level expected from a competent Contractor. |
| Acceptable | Proposal meets all the requirements of the solicitation with no deficiencies or affirmative exceptions to the solicitation requirements.  A good probability of success in contract performance is demonstrated as follows:  (1) the proposal reflects a satisfactory understanding of the solicitation requirements; and (2) the level of performance risk associated with the proposal is no more than the level expected from a competent Contractor.<br><br>(A "deficiency" is a material failure of a proposal to meet a solicitation requirement or a combination of significant weaknesses in a proposal that increases the risk of unsuccessful contract performance to an unacceptable level.  A "significant weakness" in the proposal is a flaw that appreciably increases the risk of unsuccessful contract performance.) |

3

AR Tab 14.1 at 2218-19.  With regards to the RFP's relevant past performance factor, the RFP provides that offerors may submit up to three reference contracts ("Reference Contract") to demonstrate relevant past performance.  AR Tab 11(a) at 579.  The RFP also provides that:

> The Government reserves the right to obtain information for use in the evaluation of past performance from any and all sources including sources outside of the [g]overnment . . . .  The [g]overnment will consider the quality of an offeror's past performance.  This consideration is separate and distinct from the Contracting Officer's responsibility determination.

*Id*. at 576.

In addition, the RFP provides that:

> The assessment of the offeror's relevant past performance will be used as a means of evaluating the relative capability of the offeror and other competitors to successfully meet the requirements of the RFP.  In determining the rating for the past performance evaluation factor, the [g]overnment will give greater consideration to the contracts which the [g]overnment feels are most relevant to the RFP.

*Id*. at 576-77.  Offerors could also submit past performance questionnaires for each of their Reference Contracts.  *Id.* at 579.  And so, the TET reviewed the past performance references submitted by each offeror, and conducted its own search of the Past Performance Information Retrieval System ("PPIRS") and the Contract Performance Assessment Reports ("CPARS") databases, to evaluate past performance.  AR Tab 11(a) at 579; AR Tab 25 at 1158.

The RFP also provides that the relevance of a particular Reference Contract was to be determined by analyzing the scope, magnitude and complexity of the Reference Contracts and comparing each contract to the requirements for the Alaska Contract.  AR Tab 11 at 578; AR Tab 14.1 at 2211.  In this regard, the RFP provides that:

> The Contractor is provided an opportunity to demonstrate relevant past performance on contracts currently being performed or performed within the past three . . . years.  The [g]overnment will determine relevance by analyzing the "scope", "magnitude" and "complexity" of the [R]eference [C]ontracts and comparing them to the instant requirement.  The [g]overnment reserves the right to evaluate submitted projects individually or in the aggregate in order to determine relevance and will do so consistently across all evaluated offers.  The [g]overnment will consider the quality of the Contractor's relevant past performance.

AR Tab 11 at 578.  The RFP also provides that:

4

> The Contractor may submit up to a maximum of three . . . contracts for evaluation.  The [g]overnment reserves the right to obtain information from sources other than those identified by the Contractor.  . . .  If a teaming arrangement is being proposed, refer to Notes #1 and 2 below for additional proposal submission requirements.  . . . .  [Note #1 provides that w]here a teaming arrangement (as defined at FAR Subpart 9.6) is proposed, an additional maximum of up to three . . . projects for partner(s)/subcontractor(s) may be submitted.  Thus, a maximum of no more than six . . . projects ([three] for the prime and [three] for the subs or other partners) may be submitted in total.

*Id.* at 579.

With regards to the RFP's management approach factor, the RFP provides that management approach would be evaluated in three areas:  (1) quality assurance; (2) transition; and (3) staffing.  *Id.* at 581.  Lastly, the RFP also provides that the quality assurance sub-factor has two sub-topics: (1) field supervision and (2) quality control ("QC").[2]  *Id.* at 581-82.

### 1.    The FPS's Evaluation Process

The FPS received timely proposals from several offerors, including ProSecure and MaxSent.  *See* AR Tabs 21 and 22.  To conduct the evaluation of responsive proposals, the FPS established relevancy benchmarks for each past performance relevancy criteria—scope, magnitude and complexity.  AR Tab 14.1 at 2208.  These benchmarks are as follows:

(1) Scope:  PSO Services;
(2) Magnitude:  An [o]fferor had to demonstrate at least 138,000 annual hours or more;
(3) Complexity:  (a) [p]roviding armed guards (b) [p]erforming security services similar to the FPS statement of work in regards to [the] type of PSO qualifications and training requirements; type of permit, licensure and certification requirements in performance of the effort; typical duties/responsibilities required of security force; type of protection required (e.g. interior and exterior building protection versus exterior-only protection and gate access control) [and] (c) [s]ervices provided in a geographic dispersion of locations, statewide or larger.

AR Tab 25 at 1165-66.

---

[2] The RFP also provides that the field supervisor plan, transition plan and staffing plan would be evaluated under the management approach factor.  AR Tab 11 at 581-84.

### a.      MaxSent's Technical Evaluation

During the evaluation process, the TET rated MaxSent's proposal as "highly acceptable" under the RFP's relevant past performance factor and "highly acceptable" under the RFP's management approach factor.  *Id.* at 1174.  Specifically, with regards to the relevant past performance factor, MaxSent submitted three past performance Reference Contracts that the TET determined were "highly relevant," with one being the incumbent contract.  *Id.* at 1174-76.  In this regard, the TET determined that MaxSent's incumbent Alaska project was the "most directly relevant" project to the RFP's requirements.  *Id.* at 1175.  In making this determination, the TET noted that the MaxSent's incumbent project did not satisfy the magnitude benchmark for the Alaska Contract, but that this shortfall was "only because the number of posts/hours has increased for the current requirement."  *Id.*

The TET also deemed MaxSent's two other past projects to be fully relevant in all three relevancy areas and the TET noted that the "[q]uality ratings for all available projects exceed contract requirements, no negative trends were noted, and all noted discrepancies were adequately addressed."  *Id.* at 1176.  In addition, the TET found that, "[b]ased on [MaxSent's] performance under the projects mentioned above, the level of risk associated with this vendor is substantially less than the level expected from a competent vendor."  *Id.*  And so, the TET rated MaxSent's proposal as "highly acceptable" under the relevant past performance factor.  *Id.* at 1174, 1176.

With regard to the RFP's management approach factor, MaxSent proposed [* * *] field level supervisors—[* * *] full-time and [* * *] part-time supervisors.  *Id.* at 1177.  MaxSent also proposed that supervision would be provided at [* * *].  *Id.*  The TET awarded MaxSent's proposal a strength under the management approach factor, because MaxSent would have, at a minimum, [* * *]—an approach that "assures on site supervision in remote areas and reduces the risk of non-compliance and poor performance resulting in less oversight needed by FPS."  *Id.*

To address QC, MaxSent proposed a [* * *] who would visit each post [* * *], resulting in a 100% inspection every [* * *].  *Id.* at 1178.  The TET assigned a strength to MaxSent's proposal for this proposed solution, because it "will result in a high-quality [QCP] that will be a benefit to the [g]overnment by reducing the number of deficient post inspection and need for [g]overnment oversight."  *Id.*  The TET also assigned a strength to MaxSent's proposal because

MaxSent proposed having "[* * *][,]" which the TET noted "reduces risk to the government by having a dedicated person to staff remote posts [at all times]."  *Id.* at 1180-81.  In addition, the TET determined that the staffing and transition plans proposed by MaxSent were adequate.  *Id.* at 1179-80.

Based upon the aforementioned technical evaluation, the TET found that MaxSent's proposal demonstrated a "superior" understanding of the RFP's requirements, showed approaches that were beneficial to the government and that the level of performance risk associated with MaxSent's proposal was "substantially less" than the level expected from a competent contractor.  *Id.* at 1181.  And so, the TET rated MaxSent's proposal as "highly acceptable" under the management approach factor.  *Id.*

### b.        ProSecure's Technical Evaluation

During the evaluation process, the TET rated ProSecure's proposal as "acceptable" under the RFP's relevant past performance factor and "acceptable" under the RFP's management approach factor.  *Id.*  Specifically, with regards to the relevant past performance factor, ProSecure submitted three Reference Contracts for which it listed itself as the prime contractor.  AR Tab 22(a) at 1035, 1050-57.  But, ProSecure did not submit any past performance references for its joint venture partner Meritus.  *See id.*  The FPS also considered six other projects involving ProSecure's partner AEPS, which the TET obtained from CPARS.  AR Tab 25 at 1185-86.

The TET found that the three Reference Contracts that ProSecure submitted demonstrated a mix of relevant and partially relevant experience.  *Id.* at 1182.  Specifically, the TET found that:  (1) one contract was determined to demonstrate fully relevant experience, meeting the magnitude, scope, and complexity benchmarks set by the TET; (2) one contract was only partially relevant, in that it met the scope and magnitude requirements, but not the complexity benchmark; and (3) one contract was only partially relevant, in that it met the scope and complexity requirement, but not the magnitude requirement.  *Id.* at 1182-85.  The TET also found that, "[b]ased on the contractor's performance under the projects[,] . . . the level of risk associated with this vendor is no more than the level expected from a competent vendor."  *Id.* at 1186.  And so, the TET rated ProSecure's proposal as "acceptable" under the RFP's relevant past

performance factor.[3]  *Id.*

With regards to the management approach, ProSecure proposed a supervisor at each regional command.  *Id.* at 1187.  The TET awarded ProSecure a strength for this approach and noted that on-site supervisors in remote areas reduced the risk of non-compliance and poor performance.  *Id.*

The TET also assigned two weaknesses to ProSecure's proposal.  *Id.*  First, the TET assigned a weakness for proposing that supervisors be "the first line in executing the QCP and provid[ing] daily inspections at each facility[, which]. . . reduces supervisory hours when QC inspections are being conducted."  *Id.*  Second, the TET assigned a weakness for not providing PSOs training every 60 days, as required to maintain their certifications.  *Id.*  Because the TET determined that ProSecure's approaches to QC, transition, staffing, and remote post coverage were adequate, the TET assigned ProSecure's proposed management approach a rating of "acceptable."  *Id.* at 1188-91.

### c.        The Price Analysis

During the evaluation of price, the FPS evaluated all offerors' prices for reasonableness and realism, consistent with the RFP.  AR Tab 31 at 1507.  The FPS found that all offerors' prices were realistic and reasonable, adequate price competition had been achieved, and "the level of risk associated with the pricing proposal of each offeror [was] considered acceptable[.]"  *Id.*  With regards to MaxSent and ProSecure, the FPS found that MaxSent—the highest rated technical offeror—had the second-lowest price among offerors with acceptable or higher ratings for each technical factor.  *Id.* at 1507-08.  The FPS also found that ProSecure had the lowest price among the same group of offerors.  *Id.*  And so, the FPS concluded that MaxSent's proposed price was 4.875% higher than ProSecure's proposed price, resulting in a premium of $387,340.91 annually.  *Id.* at 1508.

### 2.        The Source Selection Decision And Award

---

[3] The TET report "discussed all of the past performance information provided along with the comments in [the] CPARs" and noted that "[t]he CPARs for [joint venture partner] AEPS were relevant in terms of scope, magnitude and complexity."  AR Tab 25 at 1186.  The TET also noted that ProSecure did not submit any past performance projects for Meritus, or for the newly formed joint venture ProSecure.  *Id.*

On November 22, 2019, the Source Selection Authority ("SSA") issued a decision awarding the Alaska Contract to MaxSent.  *See* AR Tab 31.  In reaching the award decision, the SSA conducted a comparative analysis and trade-off analysis of MaxSent's and ProSecure's respective proposals.  *Id.* at 1508.

The SSA discussed the relative merits of the competing offerors in her source selection decision.  *See id.* at 1508-11.  Specifically, with regards to the RFP's relevant past performance factor, the SSA determined that MaxSent's past performance "is considered superior due to its more direct relevance and larger magnitude[.]"  *Id.* at 1509.  In this regard, the SSA noted that "MaxSent's more extensive past performance stems from [it] being the incumbent on the current requirement along with a review of CPARs revealing two additional FPS projects with favorable ratings[.]"  *Id.*  The SSA also noted that, by comparison, ProSecure had "acceptable" ratings from the projects that it submitted for its joint venture partner AEPS, but Meritus "has no armed security past performance or records in CPARs."  *Id.*  Given this, the SSA determined that ProSecure had only one partner with experience, which increases the risk to the government.  *Id.*  And so, the SSA concluded that "MaxSent's quality of past performance is superior than ProSecure based on the records identified in CPARs and the relevancy of their past performance."  *Id.*

With regards to the RFP's management approach factor, the SSA found that ProSecure's proposal to have supervisors be the first in line in executing the QCP and providing daily inspections at each facility "reduces the supervisory hours when QC inspections are being conducted."  *Id.*  The SSA also noted that the training schedule for PSOs proposed by ProSecure did not allow for the officers to receive their required training often enough to maintain their certifications.  *Id.*  In addition, the SSA noted that ProSecure's proposal for field level supervision had "two notable weaknesses that pose a risk to the government."  *Id.* at 1509-10.  And so, the SSA determined that MaxSent's proposal for field level supervision was "qualitatively superior" to ProSecure's proposal.  *Id.* at 1510.

The SSA also found that MaxSent proposed a higher staffing level than ProSecure, which would "meet emergent requirements."  *Id.* at 1511; *see also* AR Tab 25 at 1226.  In this regard the SSA noted that MaxSent was the incumbent, which gave MaxSent a "better understanding to smoothly staff in the diverse, geographically disperse[d] terrain of the state of Alaska."  AR Tab

31 at 1511.  And so, the SSA determined that MaxSent's staffing plan was considered qualitatively superior to ProSecure's.  *Id.*

Based upon the aforementioned considerations, the SSA determined that the award decision for the Alaska Contract turned on whether MaxSent's superior technical approach warranted an approximately $2 million dollar premium in price.  *Id.*  The SSA concluded that MaxSent's "superior past performance record and [m]anagement [a]pproach warrant[] the price premium associated with its proposal."  *Id.*  And so, the SSA further concluded that MaxSent's proposal provided the best value to the government and she awarded the Alaska Contract to MaxSent on November 22, 2019.  *Id.* at 1511-12; *see also* AR Tab 34 at 1522.

### 3.    ProSecure's GAO Protest

Following the award of the Alaska Contract, ProSecure protested the FPS's award decision before the Government Accountability Office ("GAO").  AR Tab 38 and Tab 41.  The GAO denied ProSecure's protest on April 15, 2020.  AR Tab 46.

Thereafter, ProSecure commenced this bid protest action on June 15, 2020.  *See* Compl.

### B.    Procedural Background

ProSecure commenced this post-award bid protest action on June 15, 2020.  *Id.*  On June 18, 2020, MaxSent filed an unopposed motion to intervene, which the Court granted on June 19, 2020.  *See generally* Def.-Int. Mot. to Intervene; Order, dated June 19, 2020.

On July 1, 2020, the government filed the administrative record, which it subsequently corrected on July 7, 2020, and July 15, 2020.  *See generally* AR.  On July 15, 2020, ProSecure filed a motion for judgment upon the administrative record and a memorandum in support thereof.  *See generally* Pl. Mot.  On July 29, 2020, the government filed a response and opposition to ProSecure's motion for judgment upon the administrative record and a cross-motion for judgment upon the administrative record.  *See generally* Def. Mot.  On the same date, MaxSent filed a response and opposition to ProSecure's motion for judgment upon the administrative record, a cross-motion for judgment upon the administrative record and memorandum in support thereof.  *See* Def.-Int. Mot.; Def.-Int. Mem.

On August 10, 2020, ProSecure filed a response and opposition to the government's and MaxSent's respective cross-motions for judgment upon the administrative record and a reply in

support of its motion for judgment upon the administrative record.  *See generally* Pl. Resp. to Def.'s Mot.; Pl. Resp. to Def-Int. Mot.  On August 21, 2020, the government and MaxSent filed their respective reply briefs.  *See generally* Def. Reply; Def.-Int. Reply.

These matters having been fully briefed, the Court resolves the pending motions.

## III.    LEGAL STANDARDS

### A.    Bid Protest Jurisdiction

The Tucker Act grants the United States Court of Federal Claims jurisdiction over bid protests brought by "an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement."  28 U.S.C. § 1491(b)(1).  In bid protest cases, this Court reviews agency actions under the Administrative Procedure Act's ("APA") "arbitrary and capricious" standard.  *See* 28 U.S.C. § 1491(b)(4) (adopting the standard of review set forth in the APA).  Under this standard, an "'award may be set aside if either (1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure.'"  *Banknote Corp. of Am., Inc. v. United States*, 365 F.3d 1345, 1351 (Fed. Cir. 2004) (quoting *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332 (Fed. Cir. 2001)).

In this regard, the United States Court of Appeals for the Federal Circuit has explained that, "[w]hen a challenge is brought on the first ground, the test is 'whether the contracting agency provided a coherent and reasonable explanation of its exercise of discretion, and the disappointed bidder bears a "heavy burden" of showing that the award decision had no rational basis.'"  *Id.* (quoting *Impresa*, 238 F.3d at 1332-33).  "'When a challenge is brought on the second ground, the disappointed bidder must show a clear and prejudicial violation of applicable statutes or regulations.'"  *Id.* (quoting *Impresa*, 238 F.3d at 1333).  In addition, when reviewing an agency's procurement decision, the Court should recognize that the agency's decision is entitled to a "presumption of regularity."  *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415 (1971), *abrogated by Califano v. Sanders*, 430 U.S. 99 (1977).  "The [C]ourt should not substitute its judgment for that of a procuring agency . . . ."  *Cincom Sys., Inc. v. United States*, 37 Fed. Cl. 663, 672 (1997).  And so, "[t]he protestor must show, by a

preponderance of the evidence, that the agency's actions were either without a reasonable basis or in violation of applicable procurement law." *Info. Tech. & Applics. Corp. v. United States*, 51 Fed. Cl. 340, 346 (2001), *aff'd*, 316 F.3d 1312 (Fed. Cir. 2003) (citation omitted).

The Court's standard of review "is highly deferential." *Advanced Data Concepts, Inc. v. United States*, 216 F.3d 1054, 1058 (Fed. Cir. 2000). As long as there is "'a reasonable basis for the agency's action, the court should stay its hand even though it might, as an original proposition, have reached a different conclusion.'" *Honeywell, Inc. v. United States*, 870 F.2d 644, 648 (Fed. Cir. 1989) (quoting *M. Steinthal & Co. v. Seamans*, 455 F.2d 1289, 1301 (D.C. Cir. 1971)). But, if "the agency 'entirely fail[s] to consider an important aspect of the problem, [or] offer[s] an explanation for its decision that runs counter to the evidence before the agency,'" then the resulting action lacks a rational basis and, therefore, is defined as "arbitrary and capricious." *Ala. Aircraft Indus., Inc.-Birmingham v. United States*, 586 F.3d 1372, 1375 (Fed. Cir. 2009) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).

### B.   Judgment Upon The Administrative Record

Unlike a summary judgment motion brought pursuant to RCFC 56, "the existence of genuine issues of material fact does not preclude judgment on the administrative record" under RCFC 52.1. *Tech. Sys., Inc. v. United States*, 98 Fed. Cl. 228, 242 (2011) (citations omitted). Rather, the Court's inquiry is whether, "given all the disputed and undisputed facts, a party has met its burden of proof based on the evidence in the record." *A&D Fire Prot., Inc. v. United States*, 72 Fed. Cl. 126, 131 (2006) (citing *Bannum, Inc. v. United States*, 404 F.3d 1346, 1356 (Fed. Cir. 2005)).

### C.   Best Value Determinations

This Court affords contracting officers a great deal of discretion in making contract award decisions, particularly when the contract is to be awarded to the offeror that will provide the best value to the government. *See Banknote Corp. of Am. v. United States*, 365 F.3d at 1355-56; *TRW, Inc. v. Unisys Corp.*, 98 F.3d 1325, 1327-28 (Fed. Cir. 1996); *E.W. Bliss Co. v. United States*, 77 F.3d 445, 449 (Fed. Cir. 1996); *Lockheed Missiles & Space Co. v. Bentsen*, 4 F.3d 955, 958-59 (Fed. Cir. 1993). Given this, the Court has held that the government's best value determination should not be disturbed, if the government documents its analysis and includes a

rationale for any business judgments and trade-offs made in reaching that decision.  *See Blackwater Lodge & Training Center, Inc. v. United States*, 86 Fed. Cl. 488, 514 (2009).  And so, a decision to award a contract is least vulnerable to challenge when that decision is based upon a best value determination.  *PlanetSpace, Inc. v. United Sates*, 96 Fed. Cl. 119, 125 (2010).

## IV.    LEGAL ANALYSIS

ProSecure asserts six challenges to the FPS's evaluation process and award decision for the Alaska Contract, namely that:  (1) the FPS unreasonably disregarded relevant past performance information for ProSecure that was too close at hand to ignore; (2) the FPS's conclusions about comparative aggregate magnitude relevance were irrationally based upon a comparison of performed and maximum annual hours; (3) the FPS unreasonably concluded that MaxSent's incumbent contract was the most relevant of all projects; (4) the FPS's assignment of an increased risk to ProSecure's proposal under the RFP's relevant past performance factor was irrational and contrary to law; (5) the FPS's failure to assign a strength to ProSecure's proposal for proposing dedicated supervisors for remote posts constitutes disparate treatment; and (6) the FPS's assignment of a weakness to ProSecure's proposal for proposing to have field supervisors perform first level QC constitutes disparate treatment.  Pl. Mot. at 22-39.  And so, ProSecure requests that, among other things, the Court set aside the FPS's decision to award the Alaska Contract to MaxSent.  *Id.* at 45.

The government and MaxSent counter that the FPS conducted a rational evaluation process, consistent with the terms of the RFP and applicable law, and they argue that the FPS reasonably decided to award the Alaska Contract to MaxSent.  Def. Mot. at 14-36; Def.-Int. Mem. at 9-26.  And so, they request that the Court deny ProSecure's bid protest and sustain the agency's award decision.  Def. Mot. at 40; Def.-Int. Mem. at 30.

For the reasons discussed below, the administrative record shows that the FPS reasonably evaluated responsive proposals for the Alaska Contract, consistent with the terms of the RFP and applicable law.  The record evidence also shows that the FPS reasonably decided to award the Alaska Contract to MaxSent, based upon a rational best value determination and trade-off analysis.  And so, the Court:  (1) **DENIES** ProSecure's motion for judgment upon the administrative record; (2) **GRANTS** the government's cross-motion for judgment upon the

administrative record; (3) **GRANTS** MaxSent's cross-motion for judgment upon the administrative record; and (4) **DISMISSES** the complaint.


### A.      The FPS Reasonably Evaluated Proposals
###         Under The RFP's Relevant Past Performance Factor

#### 1.      The FPS Did Not Violate The Too Close At Hand Doctrine

As an initial matter, ProSecure has not shown that the FPS violated the too close at hand doctrine by ignoring ProSecure's past performance information.  This Court has held that the "too close at hand" doctrine requires that, if a government agency possesses personal knowledge or internal information pertaining to an offeror's contract or prior work, the agency may be obligated to consider that information even if the offeror did not cite the information in a proposal.  *Vanguard Recovery Assistance v. United States*, 101 Fed. Cl. 765, 781 (2011).  ProSecure argues in its motion for judgment upon the administrative record that the FPS unreasonably disregarded past performance information about three past projects performed by its joint venture partner AEPS, that were located on PPIRS.  Pl. Mot. at 23.  But, the administrative record shows that the FPS considered and reasonably weighed this past performance information.

In this regard, the administrative record shows that the FPS considered the past performance information about the three past projects that ProSecure identifies in its motion.[4] AR Tab 25 at 1185-86.  Specifically, the TET report states that the FPS found that "[m]ultiple CPARS were available for AEPS similar to services described in the solicitation."  *Id.* at 1185. The TET report also includes an assessment of these three projects for relevant past performance in relation to the Alaska Contract.  *Id.* at 1185-86 (finding one contract "relevant in terms of scope, magnitude and complexity" and several other contracts relevant on at least one relevancy factor).

---

[4] It is undisputed that the FPS considered the three Reference Contracts submitted by ProSecure during the evaluation of past performance.  *See* AR Tab 25 at 1185-86; *see also* Pl. Mot. at 11 ("The TET *reviewed ProSecure's three submitted projects . . . .*") (emphasis added).

The administrative record similarly shows that the SSA also considered the three additional past projects performed by AEPS in her source selection decision.  AR Tab 31 at 1508-09.  Notably, the SSA states in the source selection decision that she "has taken into account" the TET report, which, as discussed above, includes an assessment of the three AEPS projects for relevant past performance in relation to the Alaska Contract.  *Id.* at 1506.  The SSA also specifically notes in the source selection decision that "ProSecure submitted projects for their [j]oint [v]enture partner [AEPS] with a range of Satisfactory to Exceptional performance ratings across all categories."  *Id*. at 1508-09.  And so, the evidence in the administrative record makes clear that the FPS did not ignore the past projects performed by AEPS.

The record evidence also shows that the FPS reasonably weighed these past projects in evaluating ProSecure's past performance, consistent with the terms of the RFP.  Pl. Mot. at 25-29; *see also* AR Tabs 25 and 31.  As the government correctly argues, the FPS is afforded discretion in weighing past performance information.  Def. Mot. at 16.  In this case, the administrative record shows that the TET and SSA took into account the additional past projects performed by AEPS, but the agency also had concerns about the three Reference Contracts submitted by ProSecure.  Notably, the TET observes in the TET report that ProSecure did not submit any past performance projects for its joint venture partner Meritus.  AR Tab 25 at 1185-86.  And so, the FPS reasonably weighed the three additional AEPS past projects in light of ProSecure's Reference Contracts and ProSecure's status as a joint venture.[5]

Because the record evidence in this case makes clear that the FPS reasonably considered the Reference Contracts that ProSecure submitted with its proposal—as well as the additional AEPS projects located by the agency—during the evaluation of the relevant past performance factor, ProSecure has not shown that the FPS ignored known past performance information about

---

[5] The Court observes that the RFP does not require that the FPS afford the same weight to additional projects that it learns about as it affords to the Reference Contracts.  *See* AR Tab 11 at 578-79 (noting that "[t]he Contractor is provided an opportunity to demonstrate relevant past performance on contracts currently being performed or performed within the past three . . . years.").  In addition, there is nothing in the RFP that mandates that the government consider additional past performance information.  *See id.* at 576 (stating that "[t]he [g]overnment *reserves the right* to obtain information for use in the evaluation of past performance from any and all sources including sources outside of the [g]overnment.") (emphasis added).

its previous contracts.  And so, ProSecure has not shown that the FPS violated the too close at hand doctrine.[6]

### 2.   The FPS's Evaluation Of Comparative Magnitude Relevance Was Rational

ProSecure's challenge to the FPS's evaluation of the comparative magnitude relevance of the Reference Contracts under the RFP's relevant past performance factor also lacks support in the administrative record.  In its motion for judgment upon the administrative record, ProSecure argues that the FPS irrationally evaluated comparative magnitude relevance, because the agency compared the performed contract hours for ProSecure's Reference Contracts to the maximum hours for MaxSent's Reference Contracts.  Pl. Mot. at 29-31.  As ProSecure correctly observes, the record evidence shows that ProSecure and MaxSent reported the hours for their respective Reference Contracts by different metrics—maximum hours for MaxSent and actual performed hours for ProSecure.  *Id.* at 30-31; *see also* AR Tabs 21 and 22.  But, the record evidence also shows that the FPS did not violate the terms of the RFP, or act irrationally, by considering and comparing these reported hours.

First, a careful review of the RFP shows that MaxSent did not violate the RFP by submitting the maximum hours for its Reference Contracts to the FPS.  The RFP provides, in relevant part, that:

> The [g]overnment will determine relevance by analyzing the "scope", "magnitude" and "complexity" of the reference contracts and comparing them to the instant requirement.  The [g]overnment reserves the right to evaluate submitted projects individually or in the aggregate in order to determine relevance and will do so consistently across all evaluated offers.

AR Tab 11 at 578.  But, the RFP does not provide any guidance about *how* offerors should calculate or report the hours for their Reference Contracts.  *See id.* at 578-80.  And so, there is

---

[6] The Court does not address the government's waiver argument because the Court concludes that ProSecure's claim is without merit.  *See* Def. Mot. at 16-17.

nothing in the RFP to preclude MaxSent from submitting the maximum hours for its Reference Contracts.

The RFP also does not prohibit the FPS from comparing MaxSent's maximum hours for the Reference Contracts to the performed hours submitted by ProSecure. *Id.* Again, the RFP simply provides that "[t]he Government reserves the right to evaluate submitted projects individually or in the aggregate in order to determine relevance and will do so consistently across all evaluated offers." *Id.* at 578. As the government explains, this inexact guidance allows for flexibility in reporting work performed on different types of contracts. Def. Reply at 6-7. Given this, the terms of the RFP make clear that the FPS did not violate the RFP, or act irrationally, by considering MaxSent's maximum hours for the Reference Contracts, or by comparing those hours to ProSecure's performed hours.

Perhaps more importantly, the administrative record also makes clear that ProSecure has not been prejudiced by the FPS's decision to compare its actual performed hours to MaxSent's maximum hours. In this regard, the administrative record shows that, under either metric, ProSecure and MaxSent would each have received the same number of partially relevant and fully relevant Reference Contacts as the TET found during the evaluation. *Compare* AR Tab 25 at 1182 (showing that one of ProSecure's Reference Contracts was only partially relevant under either metric, because it did not meet the complexity requirement) *with id.* at 1175 (showing that MaxSent's Reference Contracts all met the scope and complexity requirements under either metric).

Specifically, the record evidence shows that the TET determined that ProSecure had one fully relevant Reference Contract and two partially relevant Reference Contracts. AR Tab 25 at 1182 (finding that: (1) one contract was fully relevant, meeting the magnitude, scope, and complexity benchmarks set by the TET; (2) one contract was only partially relevant in that it met the scope and complexity requirements, but did not meet the magnitude requirement; and (3) one contract was only partially relevant in that it met the scope and magnitude requirements but not the complexity requirement, because "it is not geographically dispersed" as the Alaska Contract.). The record evidence also shows that the TET determined that MaxSent had two fully relevant Reference Contracts and one partially relevant Reference Contract. *Id.* at 1175.

ProSecure does not dispute that, had MaxSent reported the actual performed hours for its Reference Contracts, there would have been no change to the number of MaxSent's fully relevant Reference Contracts, because two of these contracts would still have met the FPS's benchmark for magnitude. *See generally* Pl. Mot. at 30 ("While the record lacks any evidence as to the number of annual *performed* hours by MaxSent on two of its three projects . . . ."); *see also* Pl. Resp. to Def. Mot. at 12-13; Def. Mot. at 20; AR Tab 25 at 1176. It is similarly undisputed that, had ProSecure reported the maximum hours for its Reference Contracts, there would have been no change in the number of its fully relevant Reference Contracts, because the TET would have still found that one of ProSecure's Reference Contracts did not meet the FPS's complexity benchmark. *See generally* Pl. Mot. at 30-31(showing that plaintiff does not dispute that the TET would have found that ProSecure's Project 2 still failed to meet the complexity requirement under either metric); Def. Reply at 11-12; AR Tab 25 at 1182. And so, ProSecure simply has not shown how it was prejudiced by the FPS's decision to compare its performed hours to MaxSent's maximum hours.

Because ProSecure has not shown that the FPS committed an evaluation error, or that the agency's evaluation of comparative magnitude relevance lacked a rational basis, it has not prevailed on this claim.

### 3. The FPS Reasonably Found MaxSent's Incumbent Contract To Be The Most Directly Relevant To The Alaska Contract

ProSecure's third challenge to the FPS's evaluation of past performance—that the FPS irrationally determined that MaxSent's incumbent contract was the most directly relevant to the Alaska Contract—is equally unavailing. ProSecure argues that the FPS unreasonably determined that MaxSent's incumbent contract was the most relevant past project from any offeror, because this contract did not meet all three relevancy criteria and the agency did not compare the contract to the past projects of all other offerors. Pl. Mot. at 31-34. ProSecure's objections are not supported by the record evidence.

As the government persuasively argues in its cross-motion, the administrative record shows that the FPS reasonably determined that MaxSent's incumbent contract—which involves providing PSO services to the FPS in the state of Alaska—was the "most directly relevant" Reference Contract to the Alaska Contract. Def. Mot. at 22; AR Tab 25 at 1175. In this regard,

the record evidence shows that the FPS determined that MaxSent's incumbent contract was the "most directly relevant" to the Alaska Contract, because that contract involved: "(a) providing armed guards[;] (b) performing security services similar to the FPS statement of work[; and] (c) [i]t is geographically dispersed across the state of Alaska." AR Tab 25 at 1174. Indeed, it is without dispute that the Alaska Contract involves providing essentially identical protective security officer services for the FPS across the state of Alaska, as were involved in MaxSent's incumbent contract. *See generally* Pl. Mot. at 31-34 (showing that ProSecure does not dispute that MaxSent's incumbent contract involves providing essentially identical PSO services as the Alaska Contract); Def. Reply at 10; *see also* AR Tab 25 at 1174-76.

The administrative record also shows that the FPS appropriately recognized that MaxSent's incumbent contract was not of the same magnitude as the Alaska Contract, and that this fact did not preclude a finding that MaxSent's incumbent was, nonetheless, the "most directly relevant" to the Alaska Contract. AR Tab 25 at 1175. In this regard, the record evidence shows that the FPS found that MaxSent's incumbent contract was not fully relevant, "only because the number of posts/hours has increased for the current requirement." *Id.* And so, the FPS reasonably determined that, although of a smaller magnitude, MaxSent's incumbent contract was the "most directly relevant" to the Alaska Contract, given the many similarities between the two contracts. *Id.* And so, ProSecure's third bid protest challenge must also fail.[7]

### 4. The FPS Reasonably Assigned Increased Risk To ProSecure Under The Relevant Past Performance Factor

The government also persuasively argues that ProSecure's fourth challenge—that the FPS deviated from the stated evaluation criteria and irrationally assigned an increased risk to ProSecure's proposal for failing to provide any past performance information for Meritus—has been waived. Def. Mot. at 22-27. The Federal Circuit held in *Blue & Gold*, that:

---

[7] ProSecure also argues without persuasion that the FPS erred by failing to compare MaxSent's incumbent contract to the Reference Contracts submitted by all other offerors. Pl. Mot. at 32-33. ProSecure does not identify—and the Court does not find—any requirement in the RFP that the FPS conduct such a comparison. *See id.*(showing that ProSecure failed to identify a specific requirement in the RFP that mandates the FPS conduct a comparison between MaxSent's incumbent contract and the other offerors' Reference Contracts) ; *see also* AR Tab 11 at 578-80 (discussing how the FPS would evaluate the relevancy of offeror's Reference Contracts).

> [A] party who has the opportunity to object to the terms of a government
> solicitation containing a patent error and fails to do so prior to the close of
> the bidding process waives its ability to raise the same objection
> subsequently in a bid protest action in the Court of Federal Claims.

*Blue & Gold Fleet, L.P. v. United States*, 492 F.3d 1308, 1313 (Fed. Cir. 2007).  And so, this Court has long recognized that bid protest claims challenging the terms of a solicitation that are brought after the close of bidding process are untimely and, thus, waived.  *See, e.g.*, *Phx. Mgmt., Inc. v. United States*, 125 Fed. Cl. 170, 180-83 (2016).

ProSecure argues that the FPS deviated from the RFP's stated evaluation criteria and improperly assigned an increased risk to its proposal, because the FPS found that only one of ProSecure's joint venture partners—AEPS—had relevant past performance experience.  Pl. Resp. to Def. Mot. at 13-14.  It is undisputed that ProSecure did not submit any Reference Contracts for its other joint venture partner Meritus.  Pl. Mot. at 5 (showing that ProSecure does not dispute that it did not submit any Reference Contract for Meritus);  Def. Mot. at 8; AR Tab 25 at 1186.  But, ProSecure argues that it could not have done so under the terms of the RFP, because it had already submitted three Reference Contracts for AEPS.  Pl. Resp. to Def. Mot. at 17-18.  And so, ProSecure maintains that the FPS erred by requiring it to provide additional Reference Contracts for Meritus and assigning an increased risk to its proposal.  *Id.* at 18.

ProSecure's claim is, at bottom, a belated challenge to the RFP's submission requirements for the Reference Contracts.[8]  In this bid protest dispute, ProSecure questions whether it could have submitted more than its three Reference Contracts for AEPS to demonstrate relevant past performance under the terms of the RFP.  *Id.* at 15-18.  In this regard, the parties disagree about what the RFP requires.  The government argues that that the plain language of the RFP allows for ProSecure to submit up to three additional projects related to its joint venture partner Meritus, while ProSecure maintains that the RFP limits its submissions to the three Reference Contracts for AEPS.  Def. Reply at 14-15; Pl. Resp. to Def. Mot. at 17-18.

---

[8] The RFP provides that:  "The Contractor may submit up to a maximum of three . . . contracts for evaluation."  AR Tab 11 at 579.  But, the RFP further directs that if a teaming arrangement is being proposed, as is the case with ProSecure, " an additional maximum of up to three . . . projects for partner(s)/subcontractor(s) may be submitted."  *Id.* at 579-80 (emphasis added).  And so, the RFP provides that "a maximum of no more than six . . . projects ([three] for the prime and [three] for the subs or other partners) may be submitted in total."  *Id.* at 579.

The Court need not resolve this dispute, because, to the extent that ProSecure questions the RFP's submission requirements, it should have raised such concerns prior to the close of the bidding process for the Alaska Contract.  Because there is no dispute that ProSecure did not do so, ProSecure's claim is untimely and has been waived.[9]

### B.     The FPS Conducted A Reasonable Evaluation Of The Management Approach Factor

ProSecure's two disparate treatment claims related to the FPS's evaluation process under the RFP's management approach factor are also unsubstantiated by the record evidence.  To prevail on its disparate treatment claims, ProSecure "must show that the agency unreasonably downgraded its proposal for deficiencies that were 'substantively indistinguishable' or nearly identical from those contained in other proposals."  *Office Design Grp. v. United States*, 951 F.3d 1366, 1372 (Fed. Cir. 2020).  ProSecure has not met its burden with regards to either of its disparate treatment claims.

First, ProSecure's claim that the FPS engaged in disparate treatment, because the agency declined to assign a strength to ProSecure's proposal for proposing dedicated supervisors for remote locations, is belied by the record evidence showing that ProSecure and MaxSent did not put forward "substantively indistinguishable" plans for remote post supervision.  A careful review of the proposals submitted by ProSecure and MaxSent reveals that, while both offerors proposed a [* * *] for remote post locations in Juneau and Fairbanks, Alaska, MaxSent was the only offeror to propose having "[* * *]."  AR Tab 21 at 950, 1031-32.  And so, the FPS reasonably determined that MaxSent's plan would allow MaxSent to ensure that posts at remote locations are filled in cases of emergency.  AR Tab 25 at 1181.

The record evidence also shows that MaxSent proposed that "[* * *]" would be provided [* * *], to ensure continuity of supervisory service.  AR Tab 21(a) at 939.  ProSecure did not similarly provide for such an [* * *].  *See* AR Tab 22(a) at 1049 (proposing "employing one full-

---

[9] ProSecure also has not shown that the FPS employed an unstated evaluation criteria, because the RFP provides that "a maximum of no more than six . . . projects ([three] for the prime and [three] for the subs or other partners)" may be submitted to show the past performance experience of subcontractors or other partners.  AR Tab 11 at 579.

time PSO who performs as the primary worker for the [remote] facility, while providing support to this PSO in the form of one *local* part time PSO.") (emphasis in original).  And so, the FPS reasonably assigned a strength to MaxSent's proposal for its plan to have "[* * *] that can staff remote posts in emergencies" and also reasonably declined to assign a strength to ProSecure's proposal for dedicated supervisors for remote locations.[10]  AR Tab 25 at 1181; *Office Design Grp.*, 951 F.3d at 1372.

ProSecure's second claim—that the FPS treated it disparately by assigning a weakness to its proposal for proposing that field supervisors perform first-level QC—is similarly unsubstantiated.  Pl. Mot. at 39.  Again, the record evidence shows that ProSecure and MaxSent did not put forward "substantively indistinguishable" plans for field supervisors.

A review of ProSecure's proposal reveals that ProSecure proposed having its part-time field supervisors for remote locations conduct first-line QC as part of the supervisor's regular hour duties.  AR Tab 22 at 1040-41 ("When at each facility, [s]upervisors will visit each post, coordinate with the Facility Security Manager, perform QC inspections, and correct/report any noted deficiencies.").  The administrative record also shows that the FPS reasonably assigned a weakness to ProSecure's proposal for this plan, because the plan would reduce the number of supervisory hours when QC inspections are being conducted.  AR Tab 25 at 1187.

By comparison, the administrative record shows that MaxSent proposed having a [* * *] who would conduct QC inspections [* * *].  AR Tab 21 at 937-941; AR Tab 25 at 1181 (emphasis added).  Given this, the Court agrees with the government that the record evidence shows that ProSecure and MaxSent proposed different approaches to QC.  *Compare* AR Tab 22 at 1040-41 *with* AR Tab 21 at 937-941.

Because the record evidence does not show that ProSecure's plans for dedicated supervisors for remote locations and field level supervision were "substantively indistinguishable" from MaxSent's plans for these services, ProSecure has not shown that the

---

[10] ProSecure also has not shown that the FPS "unreasonably downgraded" its proposal under the management approach factor, because the FPS assigned ProSecure an "acceptable" rating under the management approach factor.  *See* AR Tab 25 at 1191; *Office Design Grp.*, 951 F.3d at 1372.

FPS engaged in disparate treatment during the agency's evaluation of the RFP's management approach factor. *Office Design Grp.*, 951 F.3d at 1372.

### C.    ProSecure Is Not Entitled To Injunctive Relief

As a final matter, ProSecure is not entitled to the injunctive relief that it seeks in this case, because it has not prevailed upon the merits of any of its claims.  ProSecure requests, among other things, that the Court enjoin MaxSent from performing the Alaska Contract.  Pl. Mot. at 43-45.  But, it is well-established that a plaintiff that has not succeeded upon the merits of its claims cannot prevail upon such a request for injunctive relief.  *Argencord Mach. & Equip., Inc. v. United States*, 68 Fed. Cl. 167, 176 (2005).  And so, the Court must also DENY ProSecure's request for injunctive relief.

## V.    CONCLUSION

In sum, a careful review of the administrative record in this matter shows that the FPS's evaluation process and award decision for the Alaska Contract were reasonable and consistent with the terms of the RFP.  ProSecure has also waived its claim related to the RFP's submission requirements for the Reference Contracts, by bringing this claim after the bidding process for the Alaska Contract has closed.  And so, for the foregoing reasons, the Court:

1. **DENIES** ProSecure's motion for judgment upon the administrative record;

2. **GRANTS** the government's cross-motion for judgment upon the administrative record;

3. **GRANTS** MaxSent's cross-motion for judgment upon the administrative record; and

4. **DISMISSES** the complaint.

The Clerk shall enter judgment accordingly.

Each party to bear its own costs.

Some of the information contained in this Memorandum Opinion and Order may be considered protected information subject to the Protective Order entered in this matter on June 19, 2020.  This Memorandum Opinion and Order shall therefore be filed **UNDER SEAL**.  The parties shall review the Memorandum Opinion and Order to determine whether, in their view, any information should be redacted in accordance with the terms of the Protective Order prior to publication.  The parties shall **FILE** a joint status report identifying the information, if any, that they contend should be redacted, together with an explanation of the basis for each proposed redaction, on or before **December 21, 2020**.

**IT IS SO ORDERED.**

s/ Lydia Kay Griggsby
LYDIA KAY GRIGGSBY
Judge